UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Fort Pierce Division)

Case No.

KRISTIN ANDERSON,

     Plaintiff,

vs.

CITY OF FORT PIERCE,

     Defendant.

_____/

## Complaint — Jury Trial Demanded

Plaintiff, Kristin Anderson, sues defendant, City of Fort Pierce, and

shows:

### Introduction and Summary

1.    This is an action for sex discrimination, including harassment,

and retaliation brought by Kristin Anderson, a female former police sergeant

with the City of Fort Pierce Police Department ("FPPD"), whom one

lieutenant described to others in the department as being nothing more than

a "badge bunny" interested in having sex with male officers, of whom a

captain stated "that little thing has no business being a sergeant," whom

another lieutenant told following her temporary reinstatement as a sergeant

that "no one" wanted her to be a sergeant, whom sergeants told male

officers shift to "stay away from her" and "don't back her up," and during whose brief tenure as a reinstated sergeant her captain and lieutenant conducted an anonymous survey of how her subordinates and fellow sergeants felt about her.  Ms. Anderson was subjected to a hostile environment following her promotion to sergeant; was demoted to police officer after filing a Charge of Discrimination with the Equal Employment Opportunity Commission; was promoted back to sergeant in return for dropping a civil-service appeal and the EEOC charge; was shortly thereafter re-demoted by a police chief who told her that he was doing so because she had complained about the behavior of others in the department, who in turn had complained about her, and who was subjected to such a steady dose of gender-based and retaliatory harassment subsequent to her second EEOC charge that it impaired her mental health to the point that she had no choice but to resign.  She sues pursuant to Title VII of the Civil Rights Act of 1964, as amended, and the Florida Civil Rights Act of 1992.

## Jurisdiction and Venue

2.      This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII")  Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343(a)(4) and 42 U.S.C. § 2000e-5(f)(3).  The Court has jurisdiction to grant declaratory and further relief pursuant to 28 U.S.C. §§ 2201 and 2202. The Court has supplemental jurisdiction pursuant

to 28 U.S.C. § 1367 to hear plaintiff's claims under the Florida Civil Rights Act of 1992 ("FCRA").

3.     Venue is proper in the Fort Pierce Division of the Southern District of Florida pursuant to 28 U.S.C. § 1391(b) because the claims arose there and City of Fort Pierce may be found there.

## Parties

4.     Kristin Anderson at all times material was a woman whom City of Fort Pierce employed as a police officer.  She is protected by Title VII and the FCRA because:

  a.     she is a woman who suffered discrimination;

  b.     she opposed what she reasonably believed to be behavior that was made unlawful employment acts by each of the two statutes; and

  c.     she participated in proceedings pursuant to both Title VII and the FCRA.

5.     The City of Fort Pierce ("Fort Pierce") is a political subdivision of the State of Florida that employs more than 501 persons.  It is an "employer" as envisioned by 42 U.S.C. § 2000e(b) and § 760.02(7), FLA. STAT. (2011).

## Satisfaction of Conditions Precedent

6.     Ms. Anderson filed Charges of Discrimination with the EEOC on or about March 1, 2011.

7.    As to Title VII, the EEOC issued Ms. Anderson a Notice of Right to Sue dated December 4, 2011, within 90 days of her receipt of which she is filing this action.

8.    As to the FCRA, more than 180 days elapsed from her filing the Charges of Discrimination without the Florida Commission on Human Relations either conciliating the charges or making a finding adverse to Ms. Anderson.

9.    All other conditions precedent have been satisfied or waived.

### Applicable Statutory Provisions

10.    Title VII provides in pertinent part at 42 U.S.C. § 2000e-2(a) that

It shall be an unlawful employment practice for an employer —

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex …; or

(2) to limit, segregate, or classify his employees … in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's … sex….

11.    Title VII further provides at 42 U.S.C. § 2000e-3(a) as follows:

**Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings.**  It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge… under this title.

12.     The FCRA provides in pertinent part at § 760.10(1), FLA. STAT.

(2011) as follows:

It is an unlawful employment practice for an employer:

(a) To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such  individual's … sex ….

(b) To limit, segregate, or classify employees … in any way which would deprive or tend to deprive any individual of employment opportunities, or adversely affect any individual's status as an employee, because of such individual's … sex….

13.     The FCRA further provides at § 760.10(7), FLA. STAT. (2011) that

It is an unlawful employment practice for an employer … to discriminate against any person because that person has opposed any practice which is an unlawful employment practice under this section, or because that person has made a charge … under this section.

## General Allegations

14.     Ms. Anderson Anderson was hired with the Fort Pierce Police

Department in February of 2004 at age 20.

15.     During the ensuing four and a half years, she:

a.      received no reprimands;

b.      was selected to be a field training officer in 2008; and

c.      was promoted on July 21, 2008 at age 23 after scoring

number one on the sergeant's exam;

d.      was then appointed to the Crisis Intervention and Awards

Board Committees;

e. was placed in charge of both the Strategic Planning Committee and the Accident Review Board; and

f. received numerous letters of accommodation and awards.

16. Ms. Anderson's rise, however, was not universally acclaimed:

a. Brian Humm, a captain, screamed to a room full of detectives that "[t]hat little girl has no business being a supervisor."

b. Katherine England, the FPPD's only female lieutenant, began a campaign of disparagement against Ms. Anderson: e.g., Ms. England wrongfully accused Ms. Anderson of having adulterous relationship with a married detective.

17. When Ms. England became Mr. Anderson's supervisor in January 2009, she continued publicly characterizing Ms. Anderson as a "badge bunny," i.e., a woman who sleeps indiscriminately with male police officers.

18. Although Ms. Anderson complained about Ms. England's treatment of her, based on Ms. Anderson's being a woman, James Nygaard, the deputy chief of police, informed her that if Ms. Anderson wished the complaint investigated, she would have to partially pay for it: unable to do so, she withdrew it.

19. Ms. Anderson in June or July 2009 — after being told when she attempted to complain informally to Gregory Kirk, a captain, that Mr. Kirk's "hands [were] tied" — filed a formal internal sexual-harassment complaint

about the behavior towards her of Ms. England and about the retaliatory behavior of Ms. England's fiancé, Rodney Nieves, a sergeant.

20.   Ms. England and Mr. Nieves responded by:

a.   Ms. England's ignoring FPPD regulations about a police officer's not having contact with someone who has filed an internal affairs complaint against that officer;

b.   Mr. Nieves's allowing cartoons mocking Ms. Anderson to be posted in his office;

c.   Mr. Nieves's refusing to follow police radio protocol and sign on at the beginning of his shift so that Ms. Anderson, whose shift was ending, could sign off and go off duty; and

d.   Mr. Nieves's screaming at and demeaning Mr. Anderson over the radio, which all on-duty personnel could hear.

21.   When Ms. Anderson inquired of Christopher Bender, the lieutenant assigned to the investigation of her complaint, Mr. Bender told her that he cared more about the stapler on his desk than he did about the investigation of her complaint.

22.   As part his "investigation" of Ms. Anderson's complaint, Mr. Bender gave Ms. Anderson on November 1, 2009, a 27-part assignment that needed to be finished by November 3, and denied her an extension when she requested one.

23.     Ms. Anderson on November 2 withdrew her complaint in an e-mail to Sean Baldwin, the chief of police, in which she complained about the inaction on it.

24.     Later that day, Mr. Baldwin summoned Ms. Anderson to his office and, in front of Messrs. Kirk and Bender, berated her about the complaint, refused to permit her to have a union steward with her and refused several times to allow her to leave the room.

25.     Ms. Anderson told the assembled males that she felt that the investigation of her complaint had been a cover-up:  at that point, Mr. Baldwin told her to "get out of my office" and that "you will be sorry."

26.     An investigation began the following day into whether Ms. Anderson had been "untruthful" and "insubordinate" concerning an August 2009 incident:

        a.     FPPD placed Ms. Anderson on administrative leave;

        b.     Mr. Baldwin, as chief, filed a formal complaint; and

        c.     Mr. Bender was assigned to do the investigation.

27.     On or about November 17, two more investigations were begun — into vacation time that another lieutenant, Robert Ridle, had approved, and a medical release to return to work that Ms. Anderson had given Mr. Ridle.

28.     Ms. Anderson filed her initial Charge of Discrimination on or

about November 20, 2009.

29.    During the five and a half months that Ms. Anderson was on administrative leave (the longest period for anyone during Mr. Baldwin's tenure as chief):

    a.    Mr. Ridle directed two sergeants to deliver to her a July 2008 evaluation, prepared by James Tedder, her prior lieutenant, and containing a negative performance comment — her rebuttal to which was never made a part of her file, even though she has a receipt for its delivery;

    b.    Ms. England filed another complaint against Ms. Anderson;

    c.    Mr. Kirk filed another complaint against Ms. Anderson.

30.    Relying upon findings by Mr. Humm (who had made the "that little girl" remark), which findings contained inconsistencies and untrue statements, Mr. Baldwin sustained three of the complaints and recommended Mr. Anderson's termination.

31.    Rather than terminate Ms. Anderson, however, following a review by the city manager, FPPD demoted Ms. Anderson to a patrol officer, which demotion Ms. Anderson and her union appealed to the civil service board.

32.    Upon her demotion to patrol officer, Ms. Anderson:

    a.    was assigned to report to Mr. Nieves, who:

        i.    instituted a bogus complaint about her to internal

affairs;

      ii.     interfered with the investigation of an on-duty accident in which Ms. Anderson was involved — including preventing witness interviews;

      iii.    fabricated a second internal affairs complaint that Ms. Anderson had been untruthful about the circumstances of the accident; and

      iv.    left Mr. Anderson at the hospital after the accident — in uniform, but without a weapon or a radio — for more than an hour after she was discharged.

      b.    had her take-home car privileges suspended, about which Mr. Baldwin said he knew nothing at the time as he acknowledged the suspension was inappropriate;

      c.    was assigned one of the older cars in the fleet, with more than 100,000 miles, while a rookie officer was given a new vehicle;

33.    Prior to the civil-service hearing, Fort Pierce offered a settlement— which Ms. Anderson's union told her that if she did not accept it, the union would not represent her at the hearing — that included reinstatement as sergeant, a three-week suspension and a six-month probationary period.

34.    Upon her return as a sergeant, Ms. Anderson was assigned to

the supervision of Mr. Tedder, who:

      a.    told her that he had "fought tooth and nail not to get you on my shift....  I still don't want you here, no one does";

      b.    told her to "[t]ake medication or whatever you have to do to just control your emotions" after she raised her voice at sheriff's deputies who were pointing rifles and her and her police officers following an armed robbery chase and were blinding the FPPD officers with their searchlights;

      c.    instructed her that she was a "relief sergeant," which position does not exist, and that if she arrived first at a scene, she would have to surrender command to any other sergeant who arrived later; and

      d.    at the order of Mr. Kirk, called in every officer and the other two sergeants on the shift to do an anonymous survey during the week of August 21, 2010 about Ms. Anderson as a sergeant, which survey included the question "have you heard any rumor about Sgt. Anderson?"

35.    Shortly after Ms. Anderson's union sent a letter August 31, 2010, asking whether the survey had been done in retaliation for her prior EEOC complaint, Mr. Tedder did an interim evaluation (which on September 9 recommended re-demotion), in which Mr. Kirk concurred (although he on September 10 recommended termination).

36.    Because Ms. Anderson was technically a probationary sergeant, pursuant to the settlement agreement, she was unable to appeal the

demotion.

37.    Mr. Baldwin then told Ms. Anderson, her union president and the
union attorney that "[s]he keeps filing complaints and then I get a complaint
on her.  I have to do something as Chief of Police and if demoting her will
solve the problem, then that's what I have to do."

38.    Ms. Anderson was demoted September 23, 2010.

39.    To the extent that Chief Baldwin took any of his actions against
Ms. Anderson based on the recommendations of lower-level supervisors,
e.g., captains, lieutenants and sergeants, the sex-discriminatory and
retaliatory motives of those lower-level supervisors infected the decisions of
Chief Baldwin, rendering him a mere "cat's paw" for persons acting with
forbidden motives.

40.    Shortly after Ms. Anderson's demotion, she responded October
11 to a call at a Walmart concerning several shoplifters — to which, although
she requested back-up, none of the male officers close to the call responded
and none of the male supervisors on the shift intervened:  the shoplifters
picked up Ms. Anderson, who is 5-feet tall and weighs 102 pounds, and
threw her against a wall, injuring her ribs.

41.    Her antagonists within the FPPD continued to pile on stressors,
e.g., in January 2011, when her patrol car went in for routine maintenance,
a bottle of vitamins found in it was seized and tested at the crime lab to

determine whether they were illegally-possessed controlled substances.

42.     It was in approximately this same time frame that Messrs. Kirk, Humm and Tedder also were overheard spreading rumors about with whom Ms. Anderson was sexually involved within the FPPD, including a former subordinate, Gregorio Collazo.

43.     Because of the treatment to which the FPPD subjected Ms. Anderson, she was diagnosed as suffering both physically and mentally: severe migraines (for which she was twice hospitalized), psychosomatic allergic reactions to stress, depression, general anxiety, anxiety disorder, panic attacks and multiple outbreaks of shingles.

44.     As Ms. Anderson's stress (and attendant, stress-induced disorders) grew more intense, two of Ms. Anderson's health care providers — Jose Pozo, M.D., a neurologist, and Glenn R. Caddy, Ph.D., a clinical psychologist — ordered Ms. Anderson off from work pursuant to the Family and Medical Leave Act, beginning June 14, 2011.

45.     Ms. Anderson's FPPD antagonists, however, continued to harass her even during her FMLA leave:

        a.     Mr. Baldwin twice attempted to terminate her during her leave; and

        b.     Mr. Kirk used his police badge to gain entrance into Ms. Anderson's gated community, which is outside the Fort Pierce city limits, and

interrogated a house guest of hers until the house guest reached Ms. Anderson by phone and relayed to Mr. Kirk her instructions to leave.

46.     When she returned from FMLA leave in September 2011:

a.     she was once again assigned one of the older vehicles in the fleet, Vehicle No. 288, with a worn out driver's seat that could not be adjusted, which made it difficult for the petite Ms. Anderson to see out the front windshield:

(1)     When Ms. Anderson brought this to FPPD's attention, it sent the vehicle to an upholstery shop to have its seat stuffed, but

(2)     When a new officer — and one who had not yet complained about sex discrimination or filed an EEOC charge — reported the same problem, FPPD's solution was to assign her a new vehicle with an adjustable seat.

b.     FPPD assigned her to work a patrol zone west of the city — a zone for which there is inadequate back-up available and the same zone in which Ms. Anderson had been injured during the shoplifter call in October 2010:

i.     On two occasions, back-up took over 20 minutes to arrive;

ii.     Ms. Anderson's sergeant acknowledged that the

situation was "ridiculous," but did nothing about it;

        iii.    No back-up partner was assigned until January 2012.

    c.    Mr. Kirk and Mr. Tedder forbade her to any longer participate in K-9 training, which she had done for the majority of her career, with three open training assignments being given instead to two white males and to a female officer who had not complained about gender discrimination.

    d.    Notwithstanding her complaint to Mr. Baldwin about Mr. Kirk's having come by her house during her FMLA leave, and the known antagonism between the two, Mr. Baldwin ordered her to work under Mr. Kirk — who issued orders that all of her supervisors were to report to him everything that she did wrong, no matter how trivial, e.g., being one minute late for work.

    e.    Mr. Baldwin denied Ms. Anderson time off to spend with her dying grandmother immediately before her grandmother's death.

    f.    Thomas Smith, one of Ms. Anderson's lieutenants, told Ms. Anderson that Mr. Kirk had ordered him that Ms. Anderson should be treated differently than anyone else.

    g.    During one grievance hearing, Mr. Baldwin screamed at Ms. Anderson and slammed his fists on the table, while Mr. Kirk laughed out loud and, when Ms. Anderson complained about being treated differently,

stated, "So sue me."

    h. Mr. Baldwin made clear a desire to fire Ms. Anderson: "Frankly, I'm sick of hearing your name and termination seems to be the only solution."

  47. Pursuant to her psychologist's advice Ms. Anderson resigned from the FPPD April 11, 2012, rather than wait to be fired in Mr. Baldwin's retaliatory wrath or made sick again by Mr. Kirk's non-stop hectoring.

## Count I:  Sex Discrimination in Violation of Title VII

  48. Plaintiff realleges and adopts, as if fully set forth in this Count, all of the allegations in ¶¶ 1-4(a), 5-7, 9-10 and  14-45, 46(a)(1), 46(b)-(h) and 47.

  49. FPPD did not treat male police officers, or women police officers who did not complain about sex discrimination, in the same way that it treated Ms. Anderson.

  50. Ms. Anderson's gender, her having internally opposed sex discrimination, and her having filed her Charge of Discrimination were substantial, motivating factors in the treatment of Ms. Anderson by FPPD co-workers and management, which thus constituted sex discrimination and retaliation in violation of both the opposition and participation clauses of Title VII and the FCRA.

  51. FPPD's conduct discriminated against Ms. Anderson with respect

to the compensation, terms, conditions, or privileges of employment because of Ms. Anderson's sex.

52.    As a direct, natural, proximate and foreseeable result of the actions of FPPD, Ms. Anderson has suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

53.    The sex discrimination and retaliation that Ms. Anderson is suffering, in violation of the statutory rights to be free from such discrimination, constitutes irreparable harm for which there is no adequate remedy at law.

54.    Ms. Anderson is entitled to recover reasonable attorneys' fees and litigation expenses:

a.    pursuant to 42 U.S.C. § 2000e-5(k) for her Title VII claims; and

b.    pursuant to § 760.11(5), Fla. Stat. (2011) for her FCRA claims.

WHEREFORE, Plaintiff, Kristin Anderson, prays that this Court will:

*One*, issue a declaratory judgment that Fort Pierce's practices toward Ms. Anderson violated Ms. Anderson's rights against sex discrimination under Title VII;

*Two*, enjoin Fort Pierce and its agents from continuing to violate

Plaintiff's statutory rights under Title VII and to make Ms. Anderson whole through reinstatement, back pay and restoration of seniority and benefits;

*Three*, enter a judgment for Ms. Anderson and against Fort Pierce for damages;

*Four*, grant Ms. Anderson her costs and reasonable attorney's fees pursuant to 42 U.S.C. § 2000e-5(k); and

*Five*, grant Ms. Anderson such other and further relief as the circumstances and law provide.

## Count II: Sex Discrimination in Violation of FCRA

55.    Plaintiff realleges and adopts, as if fully set forth in this Count, all of the allegations in ¶¶ 1-4(a), 5-6, 8-9, 12, 14-45, 46(a)(1), 46(b)-(h), 47, 49-53 and 54(b).

WHEREFORE, Plaintiff, Kristin Anderson, prays that this Court will:

*One*, issue a declaratory judgment that Fort Pierce's practices toward Ms. Anderson violated Ms. Anderson's rights under the FCRA;

*Two*, enjoin Fort Pierce and its agents from continuing to violate Ms. Anderson's statutory rights and to make Ms. Anderson whole through reinstatement, back pay and restoration of seniority and benefits;

*Three*, enter a judgment for Ms. Anderson and against Fort Pierce for damages;

*Four*, grant Ms. Anderson her costs and reasonable attorney's fees

pursuant to § 760.11(5), FLA. STAT. (2011); and

**Five**, grant Ms. Anderson such other and further relief as the circumstances and law provide.

### Count III: Opposition-Clause Retaliation in Violation of Title VII

56.     Plaintiff realleges and adopts, as if fully set forth in this Count, all of the allegations in ¶¶ 1-4(b), 5-7, 9-11, 14-47, 49 and 51-54(a).

57.     Ms. Anderson reasonably believed that the gender-based and retaliatory behavior to which she was subjected by the FPPD beginning in late 2008 and continuing through her resignation, through her co-workers and the FPPD's supervisory and management personnel, constituted unlawful employment practices under Title VII and the FCRA.

58.     The actions of the FPPD in response to Ms. Anderson's opposition to those behaviors, employment actions and the inaction of management in response to her complaints would have been materially adverse to a reasonable employee, and were harmful to the point that they could well dissuade a reasonable worker from opposing an unlawful employment practice.

WHEREFORE, Plaintiff, Kristin Anderson, prays that this Court will:

**One**, issue a declaratory judgment that Fort Pierce's practices toward Ms. Anderson violated her rights against retaliatory discrimination under Title VII;

*Two*, enjoin Fort Pierce and its agents from continuing to violate Plaintiff's statutory rights under Title VII and to make Ms. Anderson whole through reinstatement, back pay and restoration of seniority and benefits;

*Three*, enter a judgment for Ms. Anderson and against Fort Pierce for damages;

*Four*, grant Ms. Anderson her costs and reasonable attorney's fees pursuant to 42 U.S.C. § 2000e-5(k); and

*Five*, grant Ms. Anderson such other and further relief as the circumstances and law provide.

## Count IV: Opposition-Clause Retaliation in Violation of FCRA

59.    Plaintiff realleges and adopts, as if fully set forth in this Count, all of the allegations in ¶¶ 1-4(b), 5-6, 8-9, 12-47, 49-53, 54(a) and 56-57.

WHEREFORE, Plaintiff, Kristin Anderson, prays that this Court will:

*One*, issue a declaratory judgment that Fort Pierce's practices toward Ms. Anderson violated her rights under the FCRA;

*Two*, enjoin Fort Pierce and its agent from continuing to violate Ms. Anderson's statutory rights and to make Ms. Anderson whole through reinstatement, back pay and restoration of seniority and benefits;

*Three*, enter a judgment for Ms. Anderson and against Fort Pierce for damages;

*Four*, grant Ms. Anderson her costs and reasonable attorney's fees

pursuant to § 760.11(5), FLA. STAT. (2011); and

*Five*, grant Ms. Anderson such other and further relief as the circumstances and law provide.

### Count V: Participation-Clause Retaliation in Violation of Title VII

60.    Plaintiff realleges and adopts, as if fully set forth in this Count, all of the allegations in ¶¶ 1-3, 4(c), 5-9, 11, 14, 28-47, and 49-54(a).

61.    The actions of the FPPD in response to Ms. Anderson's filing each of her two Charges of Discrimination would have been materially adverse to a reasonable employee, and were harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.

WHEREFORE, Plaintiff, Kristin Anderson, prays that this Court will:

*One*, issue a declaratory judgment that Fort Pierce's practices toward Ms. Anderson violated her rights against retaliatory discrimination under Title VII;

*Two*, enjoin Fort Pierce and its agents from continuing to violate Plaintiff's statutory rights under Title VII and to make Ms. Anderson whole through reinstatement, back pay and restoration of seniority and benefits;

*Three*, enter a judgment for Ms. Anderson and against Fort Pierce for damages;

*Four*, grant Ms. Anderson her costs and reasonable attorney's fees

pursuant to 42 U.S.C. § 2000e-5(k); and

*Five*, grant Ms. Anderson such other and further relief as the circumstances and law provide.

### Count VI: Participation-Clause Retaliation in Violation of FCRA

62.    Plaintiff realleges and adopts, as if fully set forth in this Count, all of the allegations in ¶¶ 1-3, 4(c), 5-6, 8-9, 13-47, 49-53, 54(a) and 61.

WHEREFORE, Plaintiff, Kristin Anderson, prays that this Court will:

*One*, issue a declaratory judgment that Fort Pierce's practices toward Ms. Anderson violated her rights under the FCRA;

*Two*, enjoin Fort Pierce and its agent from continuing to violate Ms. Anderson's statutory rights and to make Ms. Anderson whole through reinstatement, back pay and restoration of seniority and benefits;

*Three*, enter a judgment for Ms. Anderson and against Fort Pierce for damages;

*Four*, grant Ms. Anderson her costs and reasonable attorney's fees pursuant to § 760.11(5), FLA. STAT. (2011); and

*Five*, grant Ms. Anderson such other and further relief as the circumstances and law provide.

### Jury Demand

Plaintiff demands trial by jury for all issues so triable.

Respectfully submitted,

*/s/  William R. Amlong*
WILLIAM R. AMLONG
Florida Bar Number 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar Number 275565
KAmlong@TheAmlongFirm.com
ALISON L. CHURLY-DAVIS
Florida Bar Number 97850
AChurly@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth St.,
        Second Floor
Fort Lauderdale, Florida  33301
(954)462-1983

**Attorneys for Plaintiff,**
     **Kristin Anderson**